Donald L. BRYANT, Jr., Appellant,

v.

BRYAN CAVE, LLP, and Lawrence Brody, Respondents.

No. ED 97978.

Missouri Court of Appeals, Eastern District, Division Four.

Feb. 5, 2013.

Application for Transfer Denied June 25, 2013.

---

Laurence D. Mass, Laurence D. Mass Attorney at Law, St. Louis, MO, David B. Markowitz, Joseph L. Franco, Markowitz, Herbold, Glade & Mehlhaf, P.C., Portland, OR, for Appellant.

Robert T. Haar, Susen E. Bindler, Haar & Woods, LLP, St. Louis, MO, for Respondents.

KURT S. ODENWALD, Judge.

### Introduction

Donald Bryant ("Bryant") appeals from the trial court's grant of summary judgment in favor of Lawrence Brody ("Brody") and Bryan Cave (collectively "Respondents") in Bryant's action for legal malpractice against Respondents. Bryant brought the underlying action alleging two counts of negligence in connection with an antenuptial agreement prepared by Respondents. Bryant alleges that Respondents' negligence caused his payment obligation to his former wife, Barbara Murphy ("Murphy") to unnecessarily and substantially increase upon their divorce. Respondents filed a motion for summary judgment asserting that Bryant failed to produce sufficient admissible evidence to establish the requisite proximate cause between the alleged acts of negligence and Bryant's alleged damages. The trial court found that, after an adequate period of discovery, Bryant had not produced sufficient evidence that would allow a jury to find the requisite causation to establish Bryant's claims of legal malpractice, and granted Respondents' motion for summary judgment. The evidence before us does not raise a genuine issue of fact to support a finding that the financial consequences of Bryant's divorce from Murphy proximately resulted from Respondents' actions in negotiating the antenuptial agreement. Because Bryant failed to adduce sufficient evidence allowing a jury to find this essential element to his claims of negligence, we affirm the judgment of the trial court.

### Factual and Procedural History

Construed in the light most favorable to Bryant, the record contains the following facts. In 1981, Bryant requested Brody to negotiate and draft an antenuptial agreement (hereinafter "1981 agreement") in contemplation of Bryant's upcoming marriage to Murphy. Brody negotiated the 1981 agreement with Murphy's attorney, Andrew Greensfelder ("Greensfelder"). On July 7, 1981, Bryant and Murphy executed their first antenuptial agreement. Although, the exact terms of the 1981 agreement are not at issue in this appeal, the agreement generally provided that in the event of their divorce, Murphy would receive her separate property, plus a payment from Bryant in an amount equal to 25 percent of a complicated valuation of Bryant's separate property, marital property, and gifts made by Bryant to Murphy during the marriage.

In 1985, Brody and Greensfelder began to discuss an amendment to the 1981 agreement. Bryant's stated reasons for wanting to amend the 1981 agreement were to gain the ability to purchase jointly owned marital property from Murphy in

the event of a divorce, to clarify the provision providing Bryant a credit for gifts given to Murphy against any future payment obligation, and to create a $2 million irrevocable trust for Murphy. The specifics of these negotiations are, in large part, the subject of this appeal, and are detailed more fully below. However, the parties agree that, at some point during the four-year-long negotiations, Brody and Greensfelder discussed the possibility of abandoning the complex formulas and calculations set forth in the 1981 agreement and simplifying Bryant's payment obligation to a payment of a fixed amount to Murphy. The sum of $7 million was suggested by Greensfelder as a possible amount of the fixed payment, although that figure was not presented by Greensfelder as a definite offer. In addition, Greensfelder noted that any fixed payment must include a cost-of-living increase (hereinafter "fixed-amount proposal"). After reviewing the fixed-amount proposal, Brody sent a letter to Greensfelder, a letter which Bryant also received, stating that any fixed payment must be limited to a certain percentage of Bryant's worth in order to protect Bryant in the event he suffered any substantial future financial losses. The parties agree that the discussions regarding a fixed-amount proposal ended, and both parties pursued negotiations of a revised antenuptial agreement containing terms of payment similar in form to the terms of the 1981 agreement.

On December 3, 1989, the parties executed the new antenuptial agreement (hereinafter "1989 agreement"), which replaced the 1981 agreement. The 1989 agreement generally provided that in the event of a divorce, Murphy would receive her own separate property and a payment from Bryant equal to 25 percent of a complicated valuation of Bryant's separate property, marital property and liability, and gifts made by Bryant to Murphy. The 1989 agreement did not adjust the valuation of Bryant's property by allowing a deduction for any capital gains tax liability on such property from the valuation. The 1989 agreement did not include any payment terms relating to the fixed-amount proposal. In consideration for entering into the 1989 agreement, Murphy received a $2 million irrevocable trust.

In 2006, Murphy filed a petition for dissolution of marriage. A divorce court found the 1989 agreement was valid. For purposes of determining the fair market value of the estate from which Bryant's payment obligation would be calculated, Bryant argued that the valuation of his assets was to be reduced by any future capital gains tax liability on said assets. The divorce court rejected Bryant's proposed valuation of assets, noting that the 1989 agreement was silent on the issue of any valuation adjustment for capital gains tax liability. Relying on *In re Marriage of Richardson*, 204 S.W.3d 382, 383 (Mo.App. S.D.2006), the divorce court held that capital gains taxes should not be deducted from the value of property unless that sale of an asset is imminent, triggering the immediate requirement to pay capital gains tax. Because there was no evidence of Bryant's intent to sell any of the assets at issue, the divorce court found that the fair market value of Bryant's assets should not be reduced by a speculative amount of any later-paid capital gains taxes. The trial court assessed the accumulated assets of the marital estate at approximately $227 million. Pursuant to the 1989 agreement, the divorce court ordered that Bryant would retain ownership of the actual assets, and further ordered that Bryant pay Murphy approximately $22.8 million over nine years.

In July 2009, Bryant filed suit against Respondents for legal malpractice. In his amended petition, Bryant alleged that Re-

spondents negligently failed to address the capital gains issue in the 1989 agreement. Specifically, Bryant alleged that the formula used in the 1989 agreement to calculate his liability to Murphy included a fair market valuation of certain assets, and that Respondents were negligent by not including a provision reducing the valuation of those assets by the amount of capital gains taxes liability Bryant would pay on the assets if such assets were sold at the time of the divorce decree (hereinafter "capital gains provision"). In a separate count, Bryant also averred that Respondents were negligent in failing to effectively pursue the fixed-amount proposal.

After discovery, Respondents filed, and the trial court granted, a motion for summary judgment. Respondents argued, *inter alia*, that Bryant failed to produce competent evidence from which a trier of fact could reasonably find that any act or omission by Respondents caused Bryant damages. The trial court found that Bryant's claims required competent evidence that, but for Respondents' negligence, Murphy would have agreed to either the capital gains provision or the fixed-amount proposal. The trial court noted that Bryant's evidence of causation was derived from inadmissible speculation that Murphy would have agreed to either of these provisions had such provisions been presented to her during the negotiations of the 1989 agreement. Absent admissible evidence of causation, the trial court granted summary judgment in favor of Respondents on Bryant's claims of legal malpractice. This appeal follows.

## Points on Appeal

On appeal, Bryant asserts multiple points of error. In his first point, Bryant argues that the trial court erred in granting summary judgment because the record contains sufficient admissible evidence that created a genuine issue of fact as to causation on both counts of negligence. In his second and third points, Bryant asserts that the trial court erred in failing to consider expert opinion evidence proffered by Bryant that created a genuine issue of fact as to causation on both counts of negligence. In his fourth point, Bryant contends that the trial court erred in applying an incorrect legal standard of causation to Bryant's claim of negligence based upon the fixed-amount proposal, and therefore improperly granted summary judgment.

## Standard of Review

We review the entry of summary judgment *de novo*. *Rice v. Shelter Mut. Ins. Co.*, 301 S.W.3d 43, 46 (Mo. banc 2009). We review the record in the light most favorable to the party against whom judgment was entered. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Defendants may establish their right to summary judgment by showing: facts negating any element of the plaintiff's cause of action; that the plaintiff has presented insufficient evidence to allow the finding of the existence of any one of the elements of the plaintiff's action; or that there is no genuine dispute as to the existence of each of the facts necessary to support a properly pleaded affirmative defense. *Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc.*, 155 S.W.3d 50, 58–59 (Mo. banc 2005). Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed. *Meramec Valley R–III School Dist. v. City of Eureka*, 281 S.W.3d 827, 835 (Mo.App. E.D.2009). The non-moving party may not rely on mere allegations and denials of the pleadings, but must use affidavits, depositions, answers to interrogatories, or

admissions on file to demonstrate the existence of a genuine issue for trial. *Id.* "Genuine" implies that the issue, or dispute, must be a real and substantial one, and not consisting merely of conjecture, theory and possibilities. *ITT*, 854 S.W.2d at 378.

Whether testimony is admissible as expert opinion evidence requires the interpretation of a statute. *Kivland v. Columbia Orthopaedic Group, LLP,* 331 S.W.3d 299, 311 (Mo. banc 2011). Accordingly, we review *de novo* the trial court's holding as to the admissibility of expert witness testimony. *Id.*

## Discussion

**I. Evidence that Murphy would have agreed to the capital gains provision or fixed-amount proposal is speculative, and does not raise a genuine issue of fact regarding causation.**

■ It is well settled in Missouri that a plaintiff alleging legal malpractice has the burden of proving the existence of an attorney-client relationship, negligence by the attorney, proximate causation of plaintiff's damages, and damages. *Klemme v. Best*, 941 S.W.2d 493, 495 (Mo. banc 1997). Failure to prove any one of these elements defeats a claim for legal malpractice. The issue presented in this appeal addresses the third element of Bryant's claims: proximate causation. Respondents argue, and the trial court found, that the summary judgment record lacks evidence from which a jury reasonably could find that Murphy would have agreed to either the capital gains provision or the fixed-amount proposal even if Respondents had more effectively advocated for the inclusion of either provision into the 1989 agreement. Bryant concedes that in order to meet his burden of adducing competent evidence of causation, the record must contain admissible evidence from which a jury reason-ably could find that Murphy would have agreed to these provisions.

Bryant's first point on appeal focuses on the sufficiency of the summary judgment evidence. Bryant contends that sufficient evidence exists from which a jury reasonably could find the requisite causal nexus between Respondents' actions and Bryant's damages, thereby creating a genuine issue of material fact that precludes the entry of summary judgment. Bryant argues that evidence of Murphy's acquiescence to numerous other provisions suggested by Bryant indicates that she likely would have agreed to the inclusion of the capital gains provision or the fixed-amount proposal into the antenuptial agreement. Bryant further asserts that Murphy's testimony from the divorce trial is admissible evidence of causation, and that his personal opinion testimony that Murphy would have agreed to the provisions at issue is admissible evidence of causation. We address each argument in turn.

### A. *Prior Negotiations*

Bryant suggests that the history of negotiations between the parties sufficiently evidences a likelihood that Murphy would have agreed to Bryant's request that the 1989 agreement include the capital gains provision or the fixed-amount proposal. In support of this argument, Bryant identifies several costly concessions made by Murphy during the negotiation of the 1981 and 1989 agreements, including a provision that allowed Bryant to subtract both the value of gifts made to Murphy and liabilities existing at the time of the divorce from any amount Bryant was required to pay Murphy upon their divorce. Bryant cites these facts as relevant evidence that Murphy was strongly motivated to finalize the 1989 agreement, even under suboptimal and potentially adverse terms, in order to obtain the $2 million irrevocable

trust Bryant offered to pay Murphy as consideration for amending the 1981 agreement. Bryant submits that these facts constitute sufficient circumstantial evidence from which a trier of fact could find that Murphy would have agreed to the inclusion of the provisions at issue had Respondents presented either of those provisions to Murphy for inclusion in the 1989 agreement. We disagree.

Evidence is logically relevant if it makes the existence of a material fact more or less probable. *State v. Body.* 366 S.W.3d 625, 632 (Mo.App. E.D.2012). We are not persuaded that Murphy's prior concessions on different contractual provisions are probative as to whether Murphy would agree to specific, unrelated contractual provisions at some future date. The evidence cited by Bryant may be probative of Murphy's desire to consummate *an* agreement in order to obtain the $2 million irrevocable trust, but such facts are not probative of Murphy's willingness to consummate *any* agreement proposed by Bryant to obtain the trust. Bryant's argument suggests that Murphy would have agreed to any financial concessions he requested given her motivation to receive a $2 million trust. Logic suggests that Bryant would not be successful at obtaining concession after concession from Murphy. Reason dictates that there is a line in the sand over which Murphy would not cross. The challenge for Bryant is providing some amount of evidence that reasonably may guide a jury to that line. This he has not done. Any conclusion as to what financial concessions Murphy would accept is too attenuated from the evidence in the record, and would require the impermissible piling of inference upon inference that results in rank speculation. *See Brandon v. Dir. of Revenue, State of Mo.,* 161 S.W.3d 909, 913 (Mo.App. E.D.2005) ("Although the trial court in a civil case is free to rely on inferences from the evidence in determining whether a party has met its burden of proof, they must be reasonable in nature, and the trial court cannot rely on guesswork, conjecture, and speculation.").

### B. Murphy's Prior Testimony

Bryant suggests next that Murphy's testimony given during the prior divorce proceedings is admissible relevant evidence that Murphy would have agreed to the capital gains provision or a fixed-amount proposal had these terms been presented to her. Bryant offered Murphy's prior trial testimony as summary judgment evidence of Murphy's predisposition to accept whatever terms were offered by Bryant. Murphy's prior testimony was deemed inadmissible hearsay by the trial court. *See United Petroleum Service, Inc. v. Piatchek,* 218 S.W.3d 477, 483 (Mo.App. E.D. 2007) (affidavit containing hearsay evidence could not be used to avoid summary judgment).

Hearsay evidence is any "statement offered to prove the truth of the matters asserted therein, resting for its value upon the credibility of the out-of-court declarant." *State v. Nabors,* 267 S.W.3d 789, 794 (Mo.App. E.D.2008). The parties do not dispute that Murphy's prior testimony is an out-of-court declaration when offered against Respondents. However, Bryant posits that Murphy's trial testimony falls outside of the prohibition against hearsay evidence because her testimony was not offered against Respondents for the truth of the matter asserted. More specifically, Bryant contends that Murphy's trial testimony is not offered for the truth of the matter asserted because Murphy offered the statements during her divorce proceedings for a purpose different than the purpose Bryant offers the testimony in this case.

■ We reject Bryant's argument as he misapplies the law regarding hearsay evidence. Hearsay consists of an out-of-court statement sought to be admitted to prove the truth of the matter asserted, and that depends on the veracity of the statement for its probative value. *State v. Kemp,* 212 S.W.3d 135, 146 (Mo. banc 2007). The trial testimony Bryant offers consists of Murphy's out-of-court statements regarding her willingness to sign agreements given to her by Bryant. The purpose for which Bryant offers this testimony is to prove the truth of what Murphy said, *i.e.,* that she would sign any agreement or document Bryant asked her to sign. The testimony proffered by Bryant has no probative value beyond that of proving Murphy's willingness to sign such agreements. Accordingly, the only relevance of Murphy's out-of-court statement is for the truth of the matter asserted, which makes the statement hearsay. *See id.* Bryant does not provide, nor do we find, any exception in Missouri law that transforms a hearsay statement into admissible non-hearsay evidence because the proponent of the evidence purports to offer the statement to prove a purpose other than that for which the declarant initially uttered the statement. Here, Bryant offers Murphy's statements for the truth of what Murphy said. Because the testimony is hearsay, the trial court properly rejected consideration of Murphy's statements when determining whether Bryant had satisfied his burden at summary judgment. *See Piatchek,* 218 S.W.3d at 481 (inadmissible hearsay evidence may not be used to avoid summary judgment.).

### C. *Bryant's Opinion Testimony*

■ As his final argument in support of his first point on appeal, Bryant argues that his personal opinion testimony as to how Murphy would have reacted to an antenuptial agreement containing a capital gains provision or fixed-amount proposal constitutes admissible evidence of causation. Bryant argues that he formed a belief that Murphy would have agreed to the provisions but for Respondents' negligence, and that his personal belief constitutes sufficient evidence of causation to avoid summary judgment. We disagree.

■ It is well established that witnesses are incompetent to testify as to the intentions of other parties. A witness's "attempt to state what was in someone else's mind is either sheer speculation or unadulterated hearsay." *Uhle v. Sachs Electric,* 831 S.W.2d 774, 777 (Mo.App. E.D.1992).

Bryant cites no direct evidence of Murphy's intentions from which he developed his personal belief that she would have agreed to the provisions at issue. In fact, Bryant acknowledged in his deposition testimony the lack of direct evidence that Murphy would have agreed to either provision. Instead, Bryant offers a history of past negotiations and his personal relationship with Murphy as evidence that he is capable of divining her intentions toward a decision she never faced. Bryant's opinion as to how Murphy would react to the capital gains provision or fixed-amount proposal is inadmissible at trial as speculation. Accordingly, the trial court correctly rejected such opinion evidence when determining whether the record contained admissible evidence to create a question of fact as to causation. *See Piatchek,* 218 S.W.3d at 481.

Having rejected each of Bryant's arguments on this point of appeal, Point One is denied.

### II. The trial court properly rejected Bryant's proffered expert witness testimony.

In his second and third points on appeal, Bryant argues that the trial court erred

when it did not consider the expert opinion evidence of Jack Cochran ("Cochran") and Carlton Marcyan ("Marcyan") in determining whether the record contained evidence sufficient to create a genuine issue of fact as to the element of causation.

Bryant offered Cochran and Marcyan as experts in the field of family law. Cochran is a family law attorney, former President of the Missouri Chapter of the American Academy of Matrimonial Lawyers, and on six prior occasions has served as an expert witness on family law matters. Marcyan possesses similar credentials and is also a former Governor of the American Academy of Matrimonial Lawyers and Fellow of the International Academy of Matrimonial Lawyers. Bryant produced an affidavit and deposition testimony from Cochran stating that Cochran had reviewed materials relevant to the negotiation of the 1989 agreement and had determined to a reasonable degree of certainty that Murphy would have agreed to the capital gains provision and fixed-amount proposal but for Respondents' negligence. Bryant also produced deposition testimony from Marcyan in which Marcyan similarly concluded that Murphy would have agreed to the capital gains provision but for Respondents' negligence. The trial court specifically found Cochran's testimony inadmissible under Section 490.065.[1] The trial court did not address the testimony of Marcyan in its order. However, given the similarity of the issues presented by the proffered testimony of both Cochran and Marcyan, we address both of these points together.

A. *Cochran*

■ Bryant challenges the trial court's rejection of Cochran's opinion testimony as being inadmissible under Section 490.065. Cochran's testimony was presented to the trial court in a summary judgment affidavit stating that, after reviewing the history of negotiations and documents related to the antenuptial agreements, Cochran believes Murphy would have agreed to the capital gains provision and the fixed-amount proposal. Cochran gave similar deposition testimony, which also was submitted as summary judgment evidence. In its order, the trial court ruled that Cochran's testimony was inadmissible as to those factual issues.

■ The admissibility of expert opinion testimony is governed by Section 490.065, which provides in relevant part:

In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Section 490.065.1. To be admissible, an expert's opinion must apply scientific, technical, or specialized knowledge to help resolve a factual issue. *Id.* Conversely, factual issues that are resolved by applying common knowledge do not require expert opinion testimony. *Collins v. Trammell,* 911 S.W.2d 635, 638 (Mo.App. E.D.1995). Expert testimony is properly excluded as to issues where the jury is as capable as the expert in drawing conclusions because the expert opinion would not assist the trier of fact. *Stucker v. Chitwood,* 841 S.W.2d 816, 818–19 (Mo.App. S.D.1992).

The central premise of Bryant's argument relating to Cochran's testimony is that the antenuptial agreement negotiations contained complicated issues of fact and law that would be difficult for the jury to understand without the assistance of an expert in family law. In his brief, Bryant suggests that the extremely complicated

---

1. All statutory references are to RSMo. Cum. Supp. (2009).

negligence analysis and equally complicated damages analysis of this case necessitates the use of expert testimony to assist the jury in understanding the causal nexus between the two. We are not persuaded.

The focus of Cochran's testimony as it relates to causation is that had Respondents incorporated the capital gains provision or fixed-amount proposal into the 1989 agreement, Murphy would have accepted either provision thereby saving Bryant substantial money when the 1989 agreement was later enforced in the divorce proceedings. The fact at issue when examining the summary judgment evidence is not a complex family law issue. Rather, the facts relating to causation are straightforward and uncomplicated: would Murphy have agreed to these particular provisions, which would have benefited Bryant and have negative financial consequences to her. More specifically, the issue for our consideration is whether the record contained evidence from which a jury reasonably could find that Murphy would have agreed to either of these provisions had they been presented to her. In this limited context, we do not find, nor do we read into the trial court's judgment, any determination that the area of law or factual background of Bryant's negotiations of the 1989 agreement was uncomplicated. However, while expert testimony may assist a jury in understanding the implications of capital gains and asset valuation, that is not the issue before us. Instead, we only consider whether the proffered expert opinion testimony is admissible on the element of causation.

After careful consideration, we reject Bryant's argument and hold that Cochran's testimony and affidavit should not be considered to determine whether Bryant has established a genuine issue of fact as to causation. We are unwilling to characterize Cochran's opinion as a product of his specialized knowledge of family law. Cochran examined the prior negotiations between Bryant and Murphy. Cochran then speculated that because of Murphy's prior willingness to concede on other issues, she probably would have agreed to other financial concessions suggested by Bryant as well. Cochran's knowledge of family law may aid a jury in understanding the context of the negotiation, the application of capital gains taxes, and the importance of the provisions at issue to an antenuptial agreement, but the value of Cochran's expertise to a jury stops there. Cochran's family law experience does not provide him with scientific, technical, or specialized knowledge helpful in predicting whether Bryant and Murphy would have negotiated an antenuptial agreement that included any form of a capital gains provision or fixed-amount proposal, or more specifically, whether Murphy would have agreed to such provisions had they been presented to her by Bryant. Cochran's opinion regarding Murphy's response to such provisions is predicated on nothing more than his understanding of human behavior, not the nuance of family law or an understanding of complex valuation and tax issues. As the trial court properly noted, Cochran's testimony merely draws an inference from prior negotiations that Murphy would have made a decision in a certain way to provisions she never saw. Cochran's testimony, as it relates to causation, applied nothing more than the common knowledge and experience of the human condition that any juror would possess. We fail to see how such testimony would assist a jury in drawing any conclusion as to how Murphy would have reacted to the provisions Bryant contends would have been included in the 1989 agreement but for Respondents negligence. Cochran's opinion as to causation, because it is not premised upon scientific, technical or

specialized knowledge, amounts to nothing more than speculation.

### B. *Marcyan*

We review and also reject the proffer of Marcyan's opinion as a basis for establishing a genuine issue of fact as to the issue of causation. Similar to the proffered testimony of Cochran, Bryant submits summary judgment evidence that Marcyan, after reviewing the history of prior negotiations between Bryant and Murphy, concluded that Murphy would have agreed to the capital gains provision had that provision been proposed as part of the 1989 agreement. Marcyan also testified at his deposition that he did not believe Greensfelder's claim that he would have advised Murphy against accepting the capital gains provision. Like that of Cochran, Marcyan's opinion as to whether Murphy would have accepted terms presented by Bryant was not derived from Marcyan's specialized knowledge of family law. Like Cochran, Marcyan's opinion was based on nothing more than his general experience of how people make decisions, an area in which a jury is as capable as Marcyan in drawing its own conclusion. Because a jury would not need expert assistance on this issue, Marcyan's testimony is not admissible under Section 490.065 and cannot serve as a basis for defeating summary judgment.

The opinion evidence of both Cochran and Marcyan as to whether Murphy would have agreed to the provisions at issue is inadmissible at trial, and cannot serve as a basis for satisfying Bryant's evidentiary burden in a summary judgment proceeding. *See Neiswonger v. Margulis,* 203 S.W.3d 754, 759 (Mo.App. E.D.2006) ("Expert opinions founded on speculation are not sufficient to raise disputed issues of fact."). Because the opinion evidence fails to create a genuine issue of fact as to the issue of causation, Points Two and Three are denied.

### III. Summary judgment is appropriate in favor of Respondents on Bryant's claim of negligence related to the fixed-amount proposal.

Consistent with its reasoning in granting summary judgment in favor or Respondents on Bryant's claim of negligence relating to the capital gains provision, the trial court found that Bryant failed to produce sufficient summary judgment evidence to create a genuine issue of fact with regard to causation on Bryant's second claim of negligence related to the fixed-amount proposal. But more specifically, the trial court explained in its judgment that there was insufficient evidence to determine the terms of any fixed-amount proposal, much less that Murphy would have agreed to any such terms. In his fourth and final point on appeal, Bryant first argues that the trial court erred in granting summary judgment on this claim by misapplying the legal standard for proving legal malpractice claims. Specifically, Bryant argues the trial court erred by requiring him to provide evidence of all the terms of the agreement that Bryant alleges would have been reached with Murphy but for Respondents' negligence. Bryant claims that to prevail on his negligence claim, he need only provide evidence supporting a finding that, but for Respondents' error, a more beneficial bargain would have been struck with Murphy. Second, Bryant contends that the record contains evidence that Murphy agreed to a specific fixed-amount proposal that was more financially beneficial to him. Finally, Bryant argues that even if the evidence does not support a finding that Murphy agreed to a specific fixed-amount proposal, the record contains sufficient summary judgment evidence to create a genuine issue of fact that Murphy would have agreed

to a term providing for a fixed-amount payment should she and Bryant divorce.

A. *Was there sufficient evidence as to the terms of a fixed-amount proposal?*

The record contains evidence of general conversations regarding a fixed-amount proposal. Such conversations are referenced in a 1988 letter sent to Brody by Greensfelder suggesting that the parties consider abandoning their prior negotiations aimed at developing a formula to determine the amount Bryant would pay to Murphy upon divorce in favor of a term in the antenuptial agreement that would require Bryant to pay Murphy a fixed amount in the event of divorce. The trial court noted that Greensfelder's letter acknowledged that the parties had not agreed as to how or whether a fixed-payment term would be indexed to inflation. In concluding that the Greensfelder letter did not constitute sufficient evidence to defeat Respondents' motion for summary judgment, the trial court explained:

> The letter does not constitute an offer which, if accepted by plaintiff, would have constituted a binding contract. The letter itself notes that there are essential terms, e.g., a cost of living index, or some other form of protection against inflation for [Murphy], which need to be agreed upon. [Bryant] submits no evidence that the parties would have agreed to all essential terms of a fixed-amount contract.

Bryant first asserts that the trial court improperly required Bryant to submit evidence sufficient for a jury to find that he and Murphy had agreed to every term in the fixed-amount proposal in order to sustain his burden of proof relating to causation. Bryant argues that the trial court erroneously granted summary judgment in favor of Respondents because it held Missouri law required Bryant to provide evidence of all of the terms of an unconsummated contract, which Bryant did not do.

Bryant mischaracterizes the trial court's judgment, which contains no such holding. In its judgment, the trial court did not hold that Missouri law requires plaintiffs in transactional malpractice cases to demonstrate that the parties agreed to every term of an unconsummated contract in order to satisfy the burden of proof. Rather, in its ruling, the trial court found that Bryant failed to adduce evidence that the parties in this case "would have agreed to all *essential terms* of a fixed amount contract." The trial court's judgment was not based, as Bryant asserts, on the absence of evidence of an eventual agreement on *all* terms of an amended antenuptial agreement, nor do we apply such a standard. Our focus is whether Bryant produced sufficient summary judgment evidence to create a genuine issue as to whether the parties agreed to the essential terms necessary to conclude an agreement, or evidence that the parties likely would have agreed to such essential terms.[2]

In his fourth point on appeal, Bryant also contends that the record provides direct and circumstantial evidence that Murphy agreed to accept a fixed-amount proposal consisting of a $7 million fixed

---

**2.** In his brief, Bryant suggests the trial court erred in its judgment because it premised its ruling on a mistaken belief that the parties intended to draft a new contract, when in fact, the parties merely would have substituted a fixed-payment term for the formula found in the 1981 agreement had Respondents pursued the fixed-amount proposal. Bryant's argument fails whether the parties contemplated entering into a new contract or merely revising terms that changed Bryant's payment obligations under the existing antenuptial agreement. In either scenario, the inquiry is the same: did Bryant offer sufficient summary judgment evidence that Murphy either agreed to, or likely would agree to, the essential terms of a fixed-payment obligation.

payment adjusted for inflation relative to the Consumer Price Index. Bryant refers this Court to a November 18, 1988 letter from Greensfelder to Brody, which states as follows:

Using numbers furnished by Ray Stranghoener at the beginning of this year, the formula which we had agreed upon for the Amendment [to the 1981 Agreement] would have provided somewhat in excess of $7 million (minus certain gifts) for [Murphy]. Fixing the amount at that number is probably not in [Murphy's] pecuniary interest, but she has nevertheless expressed a willingness to do so. I would recommend to [Murphy] that we fix the number at $7 million provided that the amount is subject to a cost of living index. I realize the index provides an element of uncertainty for [Bryant]; yet, if the number is fixed, it is necessary to protect [Murphy] from the possibility of significant inflation that would greatly decrease the value of the established amount.

Bryant contends that the letter is sufficient evidence to raise a genuine issue as to Murphy's agreement to accept a $7 million fixed payment upon divorce in lieu of any formula based payment. We disagree with Bryant's characterization of the evidence in the record.

Taking at face value Greensfelder's assertion as to Murphy's intent, the letter establishes at most that Murphy expressed a willingness to agree to a number around $7 million. We are unwilling to read into that "expression of willingness" a decision that Murphy had agreed or would agree, to accept payment of $7 million should she and Bryant divorce. Moreover, Bryant's argument ignores the opening portion of Greensfelder's letter, which expressly states that the $7 million amount is based upon a prior disclosure of Bryant's assets, a disclosure that occurred approximately 10 months prior. Greensfelder's deposition testimony makes clear, and Bryant provides no evidence to controvert, that the $7 million amount initially mentioned by Greensfelder would have been adjusted to reflect Bryant's assets and income at the time any fixed-amount proposal was consummated. The fact that the fixed-amount was specifically subject to later adjustment is compelling evidence that Murphy had not agreed to a definite amount. Rather, the record is clear that the $7 million amount mentioned by Greensfelder was a base figure to be used as a starting point to explore the possibility of negotiating a fixed-amount proposal to replace the more complicated payment formula used in the 1981 agreement.

We next address Bryant's argument that he is not required to produce evidence of the specific terms of the fixed-amount proposal in order to avoid summary judgment. Bryant posits that, in the context of a transactional malpractice claim, a plaintiff need show only that, but for the attorney's nonfeasance, the plaintiff would have achieved a more favorable result. Bryant argues the record contains sufficient summary judgment evidence that, but for Respondents' negligence, Murphy would have agreed to a revision of the antenuptial agreement containing a fixed-amount proposal that was financially more favorable to Bryant.

As the trial court noted, Bryant cites primarily Greensfelder's letter to Brody as proof that Murphy would have agreed to a revision of the 1981 agreement providing for a fixed-amount payment that would have been more favorable to Bryant than the formula-based payment. We acknowledge that Greensfelder's letter acknowledges prior discussions between the parties regarding a fixed-amount payment to Murphy should the parties divorce. How-

ever, from this point, we diverge from Bryant's analysis.

We first note that Greensfelder states only that he would recommend fixing the payment at $7 million. Greensfelder's letter lacks any suggestion that Murphy was aware of Greensfelder's overtures to Respondents. Second, as stated by Greensfelder in his letter, the existence and magnitude of a cost-of-living adjustment would directly affect, and contribute to the overall compensation that Murphy would receive from Bryant by means of a fixed-payment in the event of divorce. The cost-of-living adjustment was a material term to the fixed-amount proposal, to which the parties had not reached any agreement. *See Smith v. Hammons,* 63 S.W.3d 320, 325–26 (Mo.App. S.D.2002) (holding plaintiff and defendant failed to agree upon an amount of compensation of services agreement, a material term, and therefore no contract existed).

Equally important to our analysis is evidence of subsequent correspondence between the parties. This correspondence demonstrates that while the parties discussed a general framework of substituting a fixed-amount payment term for the formula-based payment, the parties never reached an agreement on the basic terms of any such payout. Importantly, the record lacks any evidence that the parties agreed on a cost-of-living adjustment for the amount of a fixed-amount payment, or how any adjustment would be calculated.

The record further shows that any agreement on a fixed-amount payment to Murphy was also subject to conditions suggested by Bryant. While Greensfelder insisted on a cost-of-living adjustment to protect any payment made to Murphy from devaluation by inflation, Bryant's own Amended Petition states that Bryant potentially would require a parallel protection preventing any fixed-payment made to Murphy from ever exceeding a predetermined, yet undefined, percentage of his net worth, regardless of inflation.

 Bryant asks this Court to view the uncertainty as to the exact contours of the agreement transitioning the formula based payment to Murphy to a fixed-amount payment as evidence relevant only to the damages sustained by Bryant, and not causation. We agree that uncertainty of the exact framework of an agreement is relevant to the issue of damages *when there is proof that an agreement would have been reached. See Aluminum Products Enterprises, Inc. v. Fuhrmann Tooling and Mfg. Co.,* 758 S.W.2d 119, 121 (Mo.App. E.D.1988); *Olson v. Curators of Univ. of Missouri,* 381 S.W.3d 406, 411–12 (Mo. App. W.D.2012) ("A contract can be created even if all issues have not been resolved as long as the terms of the agreement are present and reasonably certain."). However, the critical distinction here, as the trial court correctly concluded, is that Bryant did not satisfy his burden of producing sufficient evidence creating a genuine issue of fact that, but for Respondents' negligence, the parties would have agreed to payment terms that would have financially benefited Bryant more than the formula-based payment required under 1989 agreement.

The critical flaw in Bryant's fourth point on appeal is his argument that he need not provide any evidence of the terms of the fixed-amount proposal he claims would have been included in the 1989 agreement but for Respondents' negligence. Instead, Bryant proffers a lesser burden that he need only produce sufficient competent evidence from which the jury could infer that, but for Respondents' negligence, an agreement more favorable to the 1989 agreement would have been reached. Respondents counter that Bryant cannot satisfy his burden of establishing a genuine

issue of fact with regard to causation without producing evidence from which a jury could determine the essential terms of an unconsummated agreement that Bryant claims would have been concluded but for Respondents' negligence.

■ In Missouri, a plaintiff bringing a professional negligence action has the burden of producing evidence that negligence by the defendant attorney caused the plaintiff to sustain damages. *Neiswonger*, 203 S.W.3d at 758. "More specifically, a plaintiff must establish that but for his attorney's negligence, the result of the underlying proceeding would have been different." *Id.* (internal quotation and citation omitted). In the context of transactional malpractice, the parties agree, and we hold, that a plaintiff must show that an agreement more preferable to the plaintiff likely would have been consummated but for the negligence of the defendant attorney. *See Thiel v. Miller*, 164 S.W.3d 76, 85 (Mo.App. W.D. 2005). *citing Cline v. Teasdale*, 142 S.W.3d 215, 220 (Mo.App. W.D.2004) ("logically, an attorney is not negligent in failing to engage in a futile act"). Given this acknowledged standard, we must determine, in a claim for transactional malpractice, what evidence of an unconsummated contract is needed to present a genuine issue of fact as to whether a plaintiff likely would have consummated a more beneficial agreement but for the negligence of the defendant attorney. Stated another way, given the record before us, may Bryant avoid summary judgment by providing some evidence of past contract discussions and asserting that he would have concluded a "better deal" for himself but for his attorneys' negligence without providing evidence of the essential terms of a "better deal?" We hold that he may not.

■ Neither party has provided any judicial precedent on point with the facts of this case. Neither has our research found any authority squarely on point. However, our own precedent in transactional malpractice cases and related principles of contract law are instructive and guide our holding in this case that, to avoid summary judgment, Bryant was required to produce evidence of the essential terms of the more preferable agreement he alleges would have been reached but for Respondents' negligence.

Our decision in *Steward v. Goetz*, 945 S.W.2d 520 (Mo.App. E.D.1997) provides support for our holding in this case. In *Steward*, the plaintiff was a former part-owner of a business and was responsible for the financial statements of the business. As part of the sale of that business, the purchaser negotiated a provision requiring Steward to indemnify the purchaser for any inaccuracies in the business's financial statements, including overstatements of the value of the business's inventory. *Id.* at 532. Steward claims that she was unaware of her liability under this provision, and that her attorney did not advise her of this liability. After the sale of the business, the purchaser discovered that the financial statements overstated the business's inventory by $292,000. Steward was forced to repay this amount to the purchasers under the indemnity provision. *Id.* Steward then filed suit against the attorney who represented the business during the sale alleging negligence resulting from the attorney's failure to advise Steward of her liability under the indemnity provision. *Id.* Steward argued that, but for the attorney's negligence, she would not have agreed to the indemnity provision, would have negotiated more preferable terms for the sale of the business, and would not have lost $292,000. *Id.*

On appeal, this Court held that Steward failed to show that any negligence on the part of her attorney caused her any damages. *Id.* We explained that any losses suffered by Steward as a result of the inaccurate financial statements occurred in the context of a consummated sales agreement. *Id.* In that context, we focused on the lack of evidence regarding alternative outcomes had Steward objected to the indemnity provision negotiated by the purchasers in the transaction. In particular, we noted the lack of evidence that the purchasers would have closed on the sale of the business without the indemnity provision, or evidence that Steward would have obtained the same sale proceeds had the business been offered for sale without an indemnity provision. *Id.* Finding no evidence connecting Steward's injury to the alleged malpractice, we held that Steward failed to establish the requisite causal nexus between her attorney's negligence and any damages. *Id.* Implicit within our holding in *Steward* was the requirement that Steward had the burden of providing evidence of the essential terms of any alternative agreement she claimed she would have reached with either the actual purchaser, or another buyer, had the indemnity provision been removed from the agreement. Absent such evidence, Steward could not prove causation.

Although the facts presented in this appeal vary from the facts at issue in *Steward*, we nevertheless find *Steward* instructive. The claim of negligence in *Steward* relates to contractual terms that were consummated by the parties. In the case before us, the claim of negligence relates to contractual terms that were not consummated by the parties. While the allegations very slightly, we find the difference de minimus. Here, the evidence shows that negotiations of a term providing for a fixed-amount payment ended without any agreement on the amount of the fixed-payment, and without resolving material issues relating to a cost-of-living adjustment required by Murphy, and a cap on any fixed-payment that was apparently required by Bryant. The parties' failure to resolve these issues is similar to the dilemma found in *Steward* because the record before us lacks any evidence that Bryant would have received more preferable payment terms had Respondents more forcefully pursued terms providing for a fixed-amount payment to Murphy. Without evidence of the essential terms of a fixed-amount proposal, a jury is left to speculate as to Bryant's obligations under such proposal. The record contains no evidence that Murphy would have agreed to a fixed-payment of $7 million, would have agreed to any fixed-payment term absent a cost-of-living adjustment, or that Murphy would have agreed to limit her right to receive a fixed-payment by an as-of-yet undefined cap tied to a some percentage of Bryant's future worth.

We do not dispute that Bryant may have benefited from revisions to the 1981 agreement that would have simplified the terms of payment to Murphy upon divorce to a fixed-sum. We further acknowledge that evidence exists suggesting that the possible transition to a fixed-amount payment in a revised antenuptial agreement was discussed at one time between the parties. However, these facts, without more, do not to establish a genuine issue of fact that the parties would likely have reached an agreement on a fixed-payment term that would have benefited Bryant over the formula-based payment term in the 1989 agreement. The absence of admissible evidence that the parties would likely have reached an agreement as to the amount of the fixed-payment, or on issues relating to a cost-of-living adjustment and/or upper cap on any fixed-payment, renders any conclusion that Bryant and Murphy would

eventually have reached an agreement on any fixed-payment terms, much less terms that were more beneficial to Bryant, pure supposition. Without such evidence, Bryant has not raised a genuine issue of fact to support a finding that he has been damaged by Respondents' failure to pursue negotiations of terms providing for a fixed-amount payment to Murphy should the parties divorce.

Fundamental principles of contract law also counsel against inferring the existence of material terms to an agreement. Adhering to these principles is consistent with our requirement that Bryant demonstrate with some degree of specificity an agreement he alleges would have been reached but for Respondents' negligence. It is well settled in Missouri, that no contract exists where the parties reserve an agreement on material terms to future negotiations. *Frick's Meat Products, Inc. v. Coil Construction of Sedalia Inc.*, 308 S.W.3d 732, 738 (Mo.App. E.D. 2010). Although courts may infer nonmaterial terms into a contract where it is clear that the parties have reached an accord on the essential elements, we will not infer the essential terms of a contract. *See Olson*, 381 S.W.3d at 411–12; *Steward*, 945 S.W.2d at 532. "What [contractual terms are] essential depends on the agreement and its context and also on the subsequent conduct of the parties, *including the dispute which arises and the remedy sought.*" *Shellabarger v. Shellabarger*, 317 S.W.3d 77, 82 (Mo.App. E.D.2010) (emphasis added).

Applying these principles of contract law to the facts of this case, the dispute and remedy sought by Bryant require an understanding of the value of the fixed-amount payment that Murphy would have received under the payment terms Bryant alleges should have been negotiated. Even assuming, for purposes of dis-

cussion, that the parties initially agreed to a payment of about $7 million, the unyielding obstacle to Bryant's position is the fact that no agreement was ever reached on any limitation or adjustment of a fixed-amount payment. To find for Bryant on this point on appeal requires this Court to infer not only that the parties would have agreed on some version of a fixed-amount payment, but that the terms of the unconsummated and still-to-be negotiated provisions would contain terms more financially favorable to Bryant than the terms contained in the 1989 agreement. We will not and cannot conjure up contractual terms which are not supported by evidence or reasonable inference in the record. We reject the premise that Bryant, based upon the framework of an agreement that is uncertain as to its essential terms, can prove that he would have consummated some form of a later agreement that would have been more financially beneficial to him.

We are not indifferent to Bryant's contention that proof of the essential elements to a contract not formed may be a difficult to produce in some transactional malpractice cases. Nevertheless, it is black letter law that the plaintiff has the burden of demonstrating that any injury suffered by the plaintiff is not too attenuated from the negligence of the defendant. *Browne v. Creek*, 357 Mo. 576, 209 S.W.2d 900, 903 (1948). Here, the summary judgment evidence before us does not provide the essential terms of any agreement that Murphy would have accepted over the 1989 agreement. The evidence presented of limited discussions between Brody and Greensfelder regarding a fixed-amount proposal would not assist a jury in determining, without resorting to speculation, what form a fixed-amount proposal may have taken, or whether Murphy would have accepted such a proposal. Such evi-

dence is simply too vague and uncertain to provide any support for Bryant's claim of damage.

In summary judgment proceedings, we construe the evidence and reasonable inferences in favor of the non-movant. *ITT*, 854 S.W.2d at 376. While faithful to this standard, we are unable to reasonably infer from the record before us that Bryant and Murphy would have eventually agreed to some version of a revised payment term providing for a fixed-amount payment that would have financially benefited Bryant over the 1989 agreement. Without evidence of the essential terms of a fixed-amount proposal, Bryant is unable to prove that Respondents' alleged negligence caused him any damage. As in *Steward,* there is no evidence connecting the alleged injury to the alleged malpractice. The summary judgment evidence fails to present a genuine issue of fact to support an essential element to Bryant's claim of negligence relating to the fix-amount proposal. Accordingly we hold that, the trial court correctly granted summary judgment as to Bryant's fixed-amount proposal claim. Point denied.

### Conclusion

The trial court did not err in holding that Bryant failed to produce competent evidence creating a genuine issue of fact as to causation on his claims of negligence. Accordingly, the trial court's order granting summary judgment is affirmed.

LAWRENCE E. MOONEY, P.J., and PATRICIA L. COHEN, J., Concur.